# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ABDIFATAH BASHIR JAMA,

   Plaintiff,

  v.

HEATHER WEYKER, *in her individual*     Case No. 16cv1230 (JNE/TNL)
*capacity as a St. Paul Police Officer*;     ORDER
JOHN BANDEMER, *in his individual*
*and official capacities as a St. Paul*
*Police Sergeant*; ROBERT ROES 1-3, *in*
*their individual and official capacities as*
*supervisory members of the St. Paul*
*Police Department*; *and* THE CITY OF
ST. PAUL,

   Defendants.

## I.  INTRODUCTION

Plaintiff Abdifatah Bashir Jama alleges violations of his constitutional rights in an

investigation that led to his indictment by a federal grand jury and his subsequent arrest.  He sues

Defendants Heather Weyker, a police officer for the St. Paul Police Department in Minnesota;

John Bandemer, a St. Paul Police Department sergeant who is alleged to have been Weyker's

supervisor; Robert Roes 1-3, who are allegedly supervisory St. Paul police officers; and the City

of St. Paul ("St. Paul").  Weyker and Bandemer move to dismiss Jama's complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and on absolute and qualified

immunity grounds.  Dkt. No. 39.  St. Paul moves on behalf of the City of St. Paul and Robert

Roes 1-3 for judgment on the pleadings pursuant to Rule 12(c).  Dkt. No. 45.

The investigation at the core of Jama's civil complaint targeted a suspected venture

involving the sex-trafficking of minor girls across Minnesota, Tennessee, and Ohio.  The

investigation resulted in the criminal indictment of thirty people, mostly Somali, in the Middle

District of Tennessee in 2010-2011 ("Tennessee Case"). Jama alleges that Weyker fabricated evidence about him and others throughout the investigation, resulting in a tainted indictment that was further corrupted by Weyker's continuing deception, and causing his arrest and detention without probable cause.

Nineteen of Jama's co-defendants in the Tennessee Case bring separate suits similarly alleging constitutional violations, and a twenty-first person brings another related civil suit. The parties agreed to coordinated briefing on the Defendants' motions. The Court assumes familiarity with its fuller opinion in one of the related cases, *Osman v. Weyker, et al.*, No. 16cv908 ("Osman Opinion") (filed simultaneously herewith), and will not repeat that opinion's discussion verbatim here, given the overlap in allegations and arguments. Jama is represented by the same attorneys as the plaintiff in that case, and their attorneys filed consolidated opposition papers to the Defendants' motions. *See* Osman Pls.' Opp. to St. Paul Mot., Dkt. No. 50; Osman Pls.' Opp. to DOJ Mot. to Dismiss ("Osman DOJ Opp."), Dkt. No. 56.

The Court held a hearing on Defendants' motions on May 3, 2017, and now grants both motions.[1]

## II.    APPLICABLE STANDARDS

A motion to dismiss or a motion for judgment on the pleadings is appropriately granted "only when there is no dispute as to any material facts and the moving party is entitled to judgment as a [m]atter of law." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (citation omitted). To survive a Rule 12 motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

---

[1] The United States also filed a Motion to Substitute and Dismiss, which was mooted by stipulation as recognized by the March 6, 2017 Order Permitting the Osman Plaintiffs to Amend Complaints. Dkt. No. 60. Pursuant to that order, Jama filed a First Amended Complaint [Dkt. No. 61] ("FAC"), which is thus the operative complaint subject to these Rule 12 motions.

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Haney v. Portfolio Recovery Assocs., LLC*, 837 F.3d 918, 924 (8th Cir. 2016), *as amended* (Dec. 27, 2016). *See also* Osman Op. 3-4.

### III.    ALLEGATIONS

Most of the salient allegations are similar to those alleged by Osman and summarized and analyzed in the Court's order in that case. *See, e.g.*, Osman Op. 4-8. The Court briefly recounts some allegations in Jama's First Amended Complaint and other facts gleaned from the Tennessee Case record.

In 2008, Jama lived in Nashville, Tennessee. FAC ¶ 10. That year, Weyker "approached Jama and tried to pressure him to implicate members of the Somali community in various alleged crimes." FAC ¶ 12. "When Jama declined, Weyker threatened to have him prosecuted for the same alleged crimes, some of the most serious involving Jane Does One and Two." *Id.* Jama did not know Jane Doe One or Jane Doe Two. FAC ¶¶ 11, 16.

A First Superseding Indictment ("FSI") was filed in the Tennessee Case on November 3, 2010, naming 29 defendants.[2] *United States v. Jama*, No. 3:10cr260, Dkt. No. 36 (M.D. Tenn. Nov. 3, 2010) (submitted in this civil case as Ex. V in support of Weyker and Bandemer's Reply). The indictment alleged that Jama was an associate of members of two related Minneapolis-based gangs. FSI ¶ 1(f). It charged Jama with four counts: two counts of participation in a sex-trafficking conspiracy in violation of 18 U.S.C. §§ 1591(a) and 1594 (Counts 1 and 2); knowingly recruiting a minor under the age of 14 (Jane Doe One) for sex trafficking (Count 11); and conspiring to transport stolen goods in interstate commerce (Count

---

[2] Jama's complaint does not refer to the First Superseding Indictment, but counsel has acknowledged it. *See* Dkt. No. 66. Because the indictment is a matter of public record, the Court may take judicial notice of it and other documents in the Tennessee Case record. *Greenman*, 787 F.3d at 887. A Second Superseding Indictment named a thirtieth defendant.

15).  More specifically, the indictment in Count 1 charged that from October 2006 through June 2007, Jane Doe One, who was 14 or 15 years old, was transported from Minnesota to Columbus, Ohio, where Jama and others caused her to engage in commercial sex acts, FSI ¶ 9; and that sometime between April 1 and June 2, 2008, Jama and another "directed" Jane Doe One to a residence in Seattle, Washington, where she was sexually assaulted, FSI ¶ 10.  Count 15 alleged that on May 22, 2006, Jama and three other co-defendants stole approximately $120,000 in cash, among other things, from a Nashville business and that the next day, one of the co-defendants transported the stolen cash to Minnesota, FSI ¶¶ 102-03; and on September 13 and 15, 2006, after Jama and others traveled to Columbus "for the purpose of burglarizing businesses to obtain money and merchandise," members of the group stole over $8,000 worth of cash and phone cards and entered without permission another business to steal money, FSI ¶¶ 104-06.

The "crux" of the "several conspiracy counts under 18 U.S.C. §§ 2; 371; 1591(a)(1), and 2314" was that Jama "was engaged in a conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts."  FAC ¶ 24.  "No such conspiracy existed, and Defendants knew it."  *Id.*

On November 8, 2010, Jama was arrested.  FAC ¶ 25.  As with Osman, because the indictment charged Jama with sex-trafficking-related offenses, he was subject to a rebuttable presumption of pretrial detention.  FAC ¶ 27.  He was ordered detained pending trial.  *Id*.

Weyker was the lead investigator on the case.  FAC ¶ 34.  Weyker "manipulated, coerced and pressured Jane Doe One into fabricating evidence and testimony that Jama and others were forcing her [to] have sex in exchange for money in December of 2005."  FAC ¶ 42.  Jane Doe One never appeared at trial, "refus[ing] to give the coerced, false testimony at trial."  FAC ¶¶ 30,

47. "Weyker also manipulated and coerced two Somali males, whose identities are known to Plaintiff, into falsely implicating Jama in the conspiracy allegations." FAC ¶ 28.

A trial of some defendants on some counts began in Spring 2012. Jama alleges that the "charges surrounding" the allegation that he "caused Jane Doe One to engage in commercial sex acts for which [Jama and others] received things of value" were "dismissed during jury selection." FAC ¶ 30. This allegation appears to be corroborated on the Tennessee Case record. *See United States v. Jama*, No. 3:10cr260, Dkt. No. 2432 (M.D. Tenn. Apr. 26, 2012). Earlier, the district court had ordered the severance of Count 15 and other counts for a separate trial. *Id.*, Dkt. No. 1395 (Feb. 16, 2012 order).

The jury reached a verdict in the Spring 2012 trial in early May, acquitting six defendants but convicting three defendants on some counts. On May 18, 2012, Jama was released from custody on bond, subject to continuing pretrial restraints. FAC ¶ 49.

The district court in December 2012 issued an order granting the three convicted defendants' Federal Criminal Rule of Procedure 29 motions for judgments of acquittal on the basis of a variance. The government appealed that order.

Even after Jama was released on conditions, "Weyker's harassment was relentless;" she pressured him to "provide false evidence against" the co-defendants. FAC ¶ 50. Jama refused, and he "was ultimately arrested again" in August 2014. *Id.* He was then held in custody pending trial, which was stayed pending the appeals stemming from the Spring 2012 trial. *See Jama*, No. 3:10cr260, Dkt. No. 3497 (Oct. 22, 2013 order continuing trial); *see also* FAC ¶ 50.

In March 2016, three years after the government had filed its appeals, the appellate court affirmed the grant of the Rule 29 motions. The government then dropped all charges against all remaining co-defendants, and Jama was released from custody. *See* FAC ¶ 50.

Like Osman, Jama alleges that the charges of a widespread sex-trafficking conspiracy were baseless, FAC ¶ 32, and that Weyker fabricated "the overwhelming majority of the critical evidence supporting the indictments in this alleged conspiracy," FAC ¶ 33; that Weyker manipulated and coerced Jane Doe witnesses, including Jane Doe One, into lying, FAC ¶¶ 40-42; that Weyker was motivated to falsify evidence by a desire for glory, FAC ¶ 1; that Weyker "worked with almost no supervision by her employer and principal" the St. Paul Police Department, FAC ¶ 44; and that indications of Weyker's fabrication included her rough notes, questions surrounding Jane Doe Two's age and her trip to Nashville in April 2009, the acquittals of nine co-defendants who went to trial in Spring 2012, and remarks about Weyker and the case by the district and appellate courts in the Tennessee Case, FAC ¶¶ 14, 19-21, 37-38, 52-56, 58.

## IV.    SUMMARY OF ARGUMENTS

A summary of the parties' arguments on these consolidated motions is included in the Osman Opinion at pages 8-10.

## V.    LEGAL ANALYSIS

As explained fully in the Osman Opinion, pursuant to *Manuel v. City of Joliet*, 137 S. Ct. 911 (Mar. 21, 2017), Jama's claims sound, if at all, in the Fourth Amendment, not the Fifth or Fourteenth.  *See* Osman Op. 11-13; *see also id.* at 17-22.  Jama's complaint is that "[b]ut for the evidence Weyker fabricated, no probable cause existed to detain or otherwise restrict [his] liberty."  FAC ¶ 1.  In other words, his complaint is "that a form of legal process resulted in pretrial detention unsupported by probable cause."  *Manuel*, 137 S. Ct. at 919.  So "the right allegedly infringed lies in the Fourth Amendment."  *Id.*  A "constitutional division of labor" applies to claims similar to Jama's.  *Id.* at 920 n.8.  Thus, because he challenges his pretrial detention, his claim is under the Fourth Amendment, but if he had been convicted and were to

challenge the sufficiency of the evidence supporting that conviction, his claim would then be under the Due Process Clause of the Fourteenth Amendment because "once a trial has occurred, the Fourth Amendment drops out." *Id.* Jama's claims for substantive due process violations under the Fifth or Fourteenth Amendments therefore fail. *See also Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion).

The Court thus rejects the substantive due process claims on the basis of *Manuel* and *Albright*, but it also notes that to the extent these claims rely on the allegation that Jama was held in custody, rather than released on bond, because of the fabricated evidence supporting the sex-trafficking conspiracy charges, *see* FAC ¶ 27, this argument for a substantive due process claim fares no better. The Bail Reform Act requires a court to hold a detention hearing if the government moves to detain a pretrial defendant in a case that charges a violation of 18 U.S.C. § 1591. 18 U.S.C. § 3142(f)(1)(A) (2008). In that hearing, a number of procedural rights are afforded by the statute. *See id.* § 3142(f); *United States v. Stephens*, 594 F.3d 1033, 1038 (8th Cir. 2010). The court must consider (1) "the nature and circumstances of the offense charged, including whether the offense is . . . a violation of section 1591," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). If the court determines by clear and convincing evidence that there is no combination of conditions that could "reasonably assure the appearance of such person as required and the safety of any other person and the community," *id.* § 3142(f), then the court "shall order" the defendant's detention pending trial, *id.* § 3142(e). Although in a case in which the judge "finds that there is probable cause to believe that the person committed . . . an offense involving a minor victim under section . . . 1591," it "shall be presumed" that

detention is necessary, that presumption may be rebutted by other evidence at the detention

hearing. *Id.* § 3142(e)(3)(E). Moreover, the defendant's presumption of innocence remains in

force at the detention hearing. *Id.* § 3142(j). Jama does not allege any facts about his detention

hearing or hearings. Even crediting his allegations that Weyker fabricated evidence of a sex-

trafficking conspiracy and fooled the grand jury into indicting him on those charges, *see* FAC

¶ 36, the Court could not reasonably infer that the sex-trafficking-related charges caused him to

be held in custody, because the § 3142 presumption was rebuttable and multiple factors had to be

considered. "The Government must first of all demonstrate probable cause to believe that the

charged crime has been committed by the arrestee, but that is not enough." *United States v.

Salerno*, 481 U.S. 739, 750 (1987). "In a full-blown adversary hearing, the Government must

convince a neutral decisionmaker by clear and convincing evidence that no conditions of release

can reasonably assure the safety of the community or any person." *Id.* Jama was entitled, for

example, to an evaluation of the weight of the evidence against him and an assessment of his

history and characteristics, yet he does not allege that Weyker played any role in tainting any

such separate judicial determinations. The silence in Jama's complaint on this topic leaves open

the possibility that he waived his right to a hearing when he was first arrested. More imporantly,

the record reflects that even after the trial of the nine co-defendants, a panel of the Sixth Circuit

found that six of his co-defendants should remain in custody pending trial or retrial, based in part

on an evaluation of the weight of the evidence at the Spring 2012 trial. *United States v. Fahra*,

No. 13-5296, Dkt. No. 61-1 (6th Cir. Dec. 18, 2013) (submitted in this case at DOJ Reply Ex.

BB). This fact further reinforces a conclusion that Jama fails to plausibly allege substantive due

process violations on the basis of a § 3142 presumption.[3]

---

[3] In addition, the Court notes that for at least some of Jama's time in custody, his

Under the Fourth Amendment analysis, the Court must decide whether Jama plausibly alleges that the Defendants violated his right to be free from unreasonable seizure by arresting and detaining him without arguable probable cause, based on fabricated evidence.[4]

To evaluate whether a person's Fourth Amendment right has been violated by an arrest pursuant to a warrant that lacked probable cause, the court applies the analysis set out in *Franks v. Delaware*, 438 U.S. 154 (1978). *See Hawkins v. Gage Cty.*, 759 F.3d 951, 958-59 (8th Cir. 2014); *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101, 105 (1st Cir. 2013). Thus, the court considers whether there were deliberately or recklessly false statements made in support of a finding of probable cause and whether those statements were necessary to the finding of probable cause. *See Franks*, 438 U.S. at 156; *Williams v. City of Alexander*, 772 F.3d 1307, 1311 (8th Cir. 2014). The court also considers whether material information was omitted with the intent to mislead or with reckless disregard as to whether the omission was misleading. *See Williams*, 772 F.3d at 1312; *Hawkins*, 759 F.3d at 959. If, setting aside the false statements (or adding in the omitted information), there was no probable cause to arrest, then the arrest violated the Fourth Amendment. *See Williams*, 772 F.3d at 1312-13; *Hawkins*, 759 F.3d at 958-59; *Hernandez-Cuevas*, 723 F.3d at 105. Probable cause "exists when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has

---

detention apparently was unrelated to any § 3142 presumption. He alleges that after having been released on conditions in December 2012, he was "arrested again" in late August 2014. FAC ¶¶ 49-50. By then, the sex-trafficking-related charges against him had been dismissed. *See United States v. Jama*, No. 3:10cr260, Dkt. No. 2432 (M.D. Tenn. Apr. 26, 2012). His release was revoked because he violated conditions of his release, including by committing the offense of criminal trespassing. *See id.*, Dkt. No. 3643 (Sept. 3, 2014 order).

[4] Because § 1983 and *Bivens* claims are analyzed similarly, the Court does not reach the question of whether Jama's claim should have been brought under § 1983 or *Bivens*. *See* Osman Op. 13-17.

committed or is committing an offense." *Greenman v. Jessen*, 787 F.3d 882, 888 (8th Cir. 2015) (citation omitted).

Where a plaintiff alleges that she was arrested without probable cause and the defendant asserts the qualified immunity defense, courts ask whether there was "*arguable* probable cause to arrest." *Stewart v. Wagner*, 836 F.3d 978, 984 (8th Cir. 2016) (citing *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015)) (applying this standard to a Fourth Amendment claim for detention based on allegedly false and incomplete information in a probable cause statement).[5] "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the arrest violated plaintiff's clearly established right." *New*, 787 F.3d at 899. "It is clearly established that the Fourth Amendment requires a *truthful factual showing* sufficient to constitute probable cause before an arrest warrant can issue." *Peterson v. City of Plymouth*, 60 F.3d 469, 477 (8th Cir. 1995) (emphasis added) (quoting *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994)).

### a. Analysis of Jama's Claim Under the Fourth Amendment

In considering whether Jama plausibly alleges a Fourth Amendment violation, the Court disregards mere conclusory statements, focuses on well-pleaded factual allegations and accepts them as true, and applies its judicial experience and common sense. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court also properly considers the Tennessee Case court record in assessing the pleadings. *See, e.g.*, *Greenman*, 787 F.3d at 887.

---

[5] An arresting officer who had "a mistaken but objectively reasonable belief" that probable cause existed would be entitled to qualified immunity. *McCabe v. Parker*, 608 F.3d 1068, 1078 (8th Cir. 2010). Jama alleges, however, that there was no mistaken belief—rather, Weyker knowingly fabricated the material evidence. An argument could be made that the "arguable probable cause" standard would not apply if Weyker intentionally misled, but Jama does not press the point, *see* Osman DOJ Opp. 34-35, and it is not dispositive here.

Jama's core allegations closely track Osman's. Like Osman, he alleges that a jury acquitted six defendants in the Spring 2012 trial, and the court acquitted[6] the other three. In the Osman Opinion, the Court examines several orders and memoranda by the district court and two separate Sixth Circuit Court of Appeals opinions concerning the Tennessee Case, some of which both Osman and Jama cite. *See* Osman Op. 25-33. Examples include several footnotes that the district court injected into its order granting the Rule 29 motions; a pretrial memorandum at Dkt. No. 1392 concerning photographic show-ups conducted by Weyker; a July 31, 2012, detention hearing; and the Sixth Circuit opinion affirming the district court's grant of the Rule 29 motions, *United States v. Fahra*, 643 Fed. Appx. 480 (6th Cir. 2016). In Osman's case, the Court found that some of these statements by judicial officers are remarkable, and that taken all together along with other well-pleaded facts, they nudge Osman's Fourth Amendment claim over the *Iqbal* plausibility line. The Court further found that the fact that Osman was also indicted in charges of obstruction of justice relating to the prosecution of the allegedly fabricated sex-trafficking-conspiracy case does not *per se* doom her Fourth Amendment claim. *See* Osman Op. 35-37. Jama's case, however, is different.

Weyker and Bandemer argue that even if Jama plausibly alleges that Weyker fabricated evidence material to the indictment for sex-trafficking-related charges, the fact that Jama was also indicted in a non-trafficking-related count defeats his Fourth Amendment claim. They argue that Jama fails to plausibly allege that he was not in any conspiracy to transport stolen goods, which was a crime for which he was indicted (Count 15), and that it is thus clear that there was probable cause to arrest. *See* DOJ Br. 65-68. Jama counters that it is the Defendants' burden to establish their affirmative defense of arguable probable cause and that "too many fact issues

---

[6] The Court uses the word "acquittal" for consistency with the Tennessee Case opinions and the pleadings but has some reservations about it. *See* Osman Op. 23-25.

remain at this stage for the Court to rule on the effects that other charges may have had on the Osman Plaintiffs' unlawful arrests." *See* Osman DOJ Opp. 34. Moreover, Jama argues there was no arguable probable cause to arrest him in 2010 "without the fabricated evidence," as shown by the fact that the government ultimately dismissed all charges against all remaining co-defendants. *Id.* at 35.

Jama clearly and repeatedly alleges that there was never any "conspiracy to recruit and transport minors for the purpose of engaging in commercial sex acts," *e.g.*, FAC ¶ 24, but he never denies that he was in a conspiracy to transport stolen goods. He does allege that there was "no real evidence of any organized criminal syndicate or 'gang,' as noted by the Sixth Circuit," FAC ¶ 32, citing a footnote in the Sixth Circuit Court of Appeals opinion affirming the district court's grant of the three defendants' Rule 29 motions. The court's footnote acknowledged that two of the alleged gangs (the Somali Mafia and Somali Outlaws) were "actually two parts of the same gang, differentiated by age," and commented that "the prosecution produced no information about either of these gangs, *i.e.*, gang initiation and culture, organization or structure, criminal activity, etc." *Fahra*, 643 Fed. Appx. at 481 n.1. Neither of those statements can fairly be construed as a finding that the gangs did not exist, that there were no conspiracies to commit certain crimes, or that Jama was unconnected with any gang or stolen-goods conspiracy. Moreover, Jama does not allege that there were no gangs or that he has no connection to the various people alleged to be associated with the gangs. He acknowledges that he knew some of the co-defendants involved in Jane Doe Two's trip to Nashville and that he knew some of the other Tennessee Case co-defendants who lived in his neighborhood. FAC ¶¶ 10, 18.

Jama does not specifically allege that there was no probable or arguable probable cause to arrest him on the stolen-goods count in November 2010. Rather, he alleges that "but for the

fabrications of Weyker regarding the sex-trafficking charges, Jama would not have been held in custody *for such an extended period*." FAC ¶ 26 (emphasis added). He also alleges that "ultimately Jane Doe One was never produced at trial and the charges surrounding this and the other falsified allegations against Jama were dismissed during jury selection." FAC ¶ 30. But not all of the charges against him were dismissed at the 2012 trial. That trial did not involve the stolen-goods charge, because the district court had ordered that Count 15 and some other counts should be tried separately. *See United States v. Jama*, No. 3:10cr260, Dkt. No. 1395 (M.D. Tenn. Feb. 16, 2012). The closest Jama gets to alleging the total absence of probable cause on any charge is his allegation that he "never would have been indicted or detained had Weyker not fabricated evidence, coerced witnesses, and misled federal authorities." FAC ¶ 64; *see also id.* ¶ 65 (alleging that he "spent over five years in various federal custody settings as a direct and proximate result of Weyker's sprawling and tawdry scheme"). He alleges no well-pleaded facts to support this conclusory statement. Jama never alleges, for instance, that he did not know the other co-defendants named in Count 15; that he did not steal $120,000 in cash and more from a safe at a Nashville location on May 22, 2006; that the $120,000 was never transported in interstate commerce; or that he did not travel to Columbus, Ohio, to commit several robberies in September 2006.

The Court agrees with Weyker and Bandemer that Jama's complaint must fail because he does not plausibly allege that there was no probable or arguable probable cause to arrest him on Count 15 on November 8, 2010. The overt acts alleged for that count were spelled out in the First Superseding Indictment that was filed on November 3, 2010, just before his arrest. Yet Jama alleges no well-pleaded facts about any fabrication of evidence in support of that count. This absence contrasts with Jama's allegations about Weyker's fabrication of evidence for the

sex-trafficking-related counts, which include some well-pleaded facts like the allegation that Jama has never even met Jane Doe One. Further, in a criminal case as lengthy and complicated as the Tennessee Case, it is not reasonable to assume from the Government's eventual dismissal of all charges, after an appeals court affirmed the grant of three co-defendants' Rule 29 motions on the basis of a variance, that there was never probable cause to support *any* of the charges.

Even if there were no probable cause to arrest Jama based on the allegedly spurious sex-trafficking-conspiracy charges, there is no Fourth Amendment violation where there is probable cause to arrest "for the violation of some other law." *Greenman*, 787 F.3d at 889 (citation omitted); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that there is no Fourth Amendment violation if there is probable cause to arrest based on any criminal offense, even if the officer's subjective reason for arresting was a different and unrelated offense); *Keil v. Triveline*, 661 F.3d 981, 986 (8th Cir. 2011). Jama therefore "has failed to 'make out a violation of a constitutional right' in the first instance." *Greenman*, 787 F.3d at 888; *see also Keil*, 661 F.3d at 986.

Taking as true Jama's allegations that Weyker fabricated the evidence supporting the sex-trafficking charges, the Court is not unsympathetic to the argument that Jama's pretrial detention in custody may have been harder because of those charges. *See* FAC ¶¶ 68-69. But as Jama acknowledges, detention comes in different forms and is a restraint on liberty in any form. *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty."). The Fourth Amendment does not distinguish between the forms of pretrial detention; it "protects '[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures,'" and "'[a] person is seized'

whenever officials 'restrain[] his freedom of movement' such that he is 'not free to leave.'" *Manuel*, 137 S. Ct. at 917 (citations omitted).

Defendant Weyker is entitled to qualified immunity. Jama has failed to plausibly allege a constitutional violation.

### b. Supervisory Liability

Jama sues Bandemer and Robert Roes 1-3 in their individual capacities as supervisors. He alleges that they were deliberately indifferent to but not direct participants in Weyker's alleged violations.

A supervisor sued in his or her individual capacity in a § 1983 or *Bivens* suit "is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) ("Government officials are personally liable only for their own misconduct."). "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *Krigbaum*, 808 F.3d at 340 (citing *Livers*, 700 F.3d at 355). "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient." *Id.* The notice prong requires that "[t]o impose supervisory liability, other misconduct [allegedly giving the supervisor notice] must be very similar to the conduct giving rise to liability." *Id.* (quoting *Livers*, 700 F.3d at 356).

First, given the Court's conclusion that Jama has not adequately alleged a constitutional violation by Weyker, the supervisory liability claims "automatically fail for lack of an underlying

constitutional violation." *Mendoza v. U.S. Immig'n & Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)).

Moreover, Jama's complaint, which is practically identical to Osman's complaint as to the supervisory liability allegations, likewise contains few allegations—and fewer well-pleaded facts—regarding supervisory liability. Like Osman, Jama alleges that Bandemer and the Robert Roes had supervisory responsibility over Weyker, *see, e.g.*, FAC ¶¶ 6, 44; that the investigation was very important to the St. Paul Police Department vice unit, *id.* ¶ 34; and that "[b]y February 12, 2012, at the latest, Bandemer, the other supervisory Defendants, and the City had actual notice of the falsity of the allegations put forth by Weyker," based on district court orders including the memorandum-order at Dkt. No. 1392 and from news coverage, *id.* ¶¶ 45, 57-58. Like Osman, Jama cites *United States v. Mohamud*, No. 3:10cr260, 2013 WL 1935506, at *11 n. 6 (M.D. Tenn. May 9, 2013), and *United States v. Adan*, 913 F. Supp. 2d 555, 589 n.10 (M.D. Tenn. Dec. 19, 2012), in support of his supervisory liability notice allegations. FAC ¶ 58.

As explained in the Osman Opinion, these allegations do not sufficiently plead supervisory liability based on notice. *See* Osman Op. 37-41. Nor do they establish a pattern of unconstitutional acts by Weyker. Ignoring conclusory or unsupported allegations, Jama does not allege any other similar acts by Weyker before her Tennessee Case investigation that could show a pattern about which Bandemer or the Robert Roes personally knew.

The allegations fail to state a claim for supervisory liability, and Bandemer and Robert Roes 1-3 are entitled to qualified immunity as to these counts.

### c. Municipal Liability

Jama sues St. Paul as well as Bandemer and the Robert Roes in their official capacities for municipal liability under *Monell v. Department of Social Services of the City of New York*,

436 U.S. 658 (1978). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. "Instead," a municipality is liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

A plaintiff therefore must show that there is an "official" policy or a "custom or usage with the force of law." *Kelly v. City of Omaha*, 813 F.3d 1070, 1075 (8th Cir. 2016). A plaintiff must plead "allegations, reference, or language by which one could begin to draw an inference that the conduct complained of . . . resulted from an unconstitutional policy or custom." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (citation omitted). "Misconduct among a municipality's employees must be 'continuing, widespread, [and] persistent' to establish such a custom." *Kelly*, 813 F.3d at 1075 (citation omitted). "In addition, the municipality will not be liable unless policymaking officials exhibit '[d]eliberate indifference to or tacit authorization of such conduct . . . after notice to the officials of that misconduct.'" *Id.* at 1075-76 (citation omitted). The question is whether a "governmental policy or custom was the 'moving force' that led to the deprivation of [the plaintiff's] constitutional rights." *Speer v. City of Wynne*, 276 F.3d 980, 986 (8th Cir. 2002). Even if no individual employee is found liable, a municipality might still be liable, but only where "the combined actions of multiple officials or employees may give rise to a constitutional violation." *Id.*

Jama alleges that Weyker acted alone, with little supervision. *See, e.g.*, FAC ¶ 44. He does not allege facts to support conclusory allegations that Weyker or other St. Paul Police Department employees fabricated evidence in other investigations. For the same reasons given in the Osman Opinion, *see* Osman Op. 41-42, Jama's municipal liability allegations also fail.

## VI.    Conclusion

Defendants are entitled to qualified immunity on all counts, because Jama's complaint fails to plausibly allege a violation of his constitutional rights.  The Court grants the Defendants' motions and dismisses with prejudice.  *See Ulrich v. Pope Cty.*, 715 F.3d 1054, 1060-61 (8th Cir. 2013) (affirming dismissals with prejudice of Fourth Amendment and supervisory liability claims); *C.N. v. Willmar Pub. Sch., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 635 (8th Cir. 2010) (affirming dismissal of constitutional claims with prejudice for failure to state a claim under *Iqbal* standards, entitling defendants to qualified immunity).  The Court will not grant leave to amend based on a request made in passing at the end of a brief without complying with local rules or in any way indicating what changes might be made.  *See In re Baycol Prod. Litig.*, 732 F.3d 869, 880 n.8 (8th Cir. 2013).

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Defendants Heather Weyker and John Bandemer's Motion to Dismiss [Dkt. No. 39] is GRANTED.

2. Defendant City of Saint Paul's Motion for Judgment on the Pleadings [Dkt. No. 45] is GRANTED.

3. Plaintiff Abdifatah Bashir Jama's First Amended Complaint is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 9, 2017                                     s/ Joan N. Ericksen
                                                          JOAN N. ERICKSEN
                                                          United States District Judge